T.C. Memo. 2007-169


UNITED STATES TAX COURT


ESTATE OF SYLVIA GORE, DONOR, DECEASED, PAMELA POWELL,
PERSONAL REPRESENTATIVE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ESTATE OF SYLVIA GORE, DECEASED, PAMELA POWELL,
PERSONAL REPRESENTATIVE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 467-02, 468-02.          Filed June 27, 2007.


<u>Paul R. Hodgson</u> and <u>James E. Poe</u>, for petitioner.

<u>Elizabeth Downs</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


MARVEL, <u>Judge</u>:  Respondent determined a deficiency of $1,071,650 in the Federal estate tax of the Estate of Sylvia Gore

(the estate).[1]  By separate notice of deficiency, respondent determined a Federal gift tax deficiency of $918,962 with respect to Sylvia Gore's 1997 taxable year.  The personal representative of the estate filed separate petitions to redetermine the deficiencies of the estate.  These cases were consolidated for purposes of trial, briefing, and opinion pursuant to Rule 141(a) because they present common questions of fact and law.  Hereinafter, we shall refer to these consolidated cases as this case.

---

[1]All section references are to the Internal Revenue Code (Code) in effect for June 12, 1997, the date of Sylvia Gore's death, and for the taxable year 1997, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions,[2] the issues presented are:[3]

---

[2]In the estate tax notice of deficiency, respondent determined that the value of a $250,000 St. Francis Hospital, Inc. bond was includable in Sylvia Gore's (decedent's) gross estate under sec. 2038, or, alternatively, under either sec. 2031 or 2033. In the stipulation of facts, petitioner concedes that the bond is includable in decedent's gross estate.

In the estate tax notice of deficiency, respondent disallowed a deduction of $19,084 for a note payable from decedent. In the stipulation of facts, petitioner concedes that the estate is not entitled to deduct $19,084 as a debt of decedent.

In the explanation of adjustments section of the estate tax notice of deficiency, respondent determined that the fair market value of the Gore Family Limited Partnership (GFLP) was $4,997,280. However, respondent used $4,997,290 as the value of GFLP in computing the transfers during decedent's life reflected in the explanation of items. Although petitioner raised the issue of this $10 discrepancy in the petition, petitioner abandoned the issue in petitioner's trial memorandum.

During the audit in this case, a $65,000 Grand River Dam Authority bond that had not been reported as an asset of the estate for estate tax purposes was discovered. The parties agree that the Grand River Dam Authority bond was not transferred to GFLP and is includable in decedent's gross estate under sec. 2033.

[3]Petitioner has raised two additional issues, but we need not decide them in this opinion:

(1) Petitioner raised the issue of whether respondent allowed the maximum credit for State death tax under sec. 2011. The estate claimed a credit of $56,813 for State death taxes on Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, and respondent has not disallowed that credit. Petitioner represents that Oklahoma has issued alternative orders assessing additional death tax liabilities, and resolution of the estate's State death tax liability is pending before the Oklahoma Tax Commission. Respondent correctly notes that the maximum amount of credit allowed under sec. 2011 depends on the size of the adjusted taxable estate for Federal estate tax purposes. Respondent represents that he will allow an additional credit for

(continued...)

(1) Whether the values of the assets of the Sidney Gore Marital Fund (Marital Fund assets) are includable in Sylvia Gore's (decedent's) gross estate under section 2033 or section 2041;

(2) alternatively, if decedent completed a transfer of Marital Fund assets to the Gore Family Limited Partnership (GFLP) before her death, whether the values of those assets are includable in decedent's gross estate under sections 2041, 2036, and/or 2038;

(3) alternatively, if the value of the property to be included in decedent's estate is that of a 32.667-percent limited partnership interest in GFLP, whether the value of that interest on June 12, 1997, was $1,260,472, as respondent contends, or $740,036, the value reported on the estate's Federal estate tax return;

(4) if the values of the Marital Fund assets are includable in decedent's gross estate under sections 2033, 2036, 2038,

---

[3](...continued)
State death tax, if it is paid and claimed by the estate within the period specified in sec. 2011(c)(1).

(2) Petitioner also raised the issue of whether respondent erred in not applying a $192,800 Federal estate tax payment made on July 14, 2000, to reduce the amount of the estate tax deficiency respondent determined in the notice of deficiency dated Sept. 26, 2001. Respondent represents that the estate's unassessed prepayment of estate tax has been credited to the estate's account and will be treated as a July 14, 2000, payment in computing any outstanding estate tax liability as a result of this opinion.

and/or 2041(a)(2), whether decedent's gross estate should be reduced by $46,664, the amount of a note payable to decedent from GFLP;

(5) if decedent completed a transfer of the Marital Fund assets to GFLP and made gifts of GFLP limited partnership interests to the trusts for decedent's children before her death, whether the gifts to the trusts should be treated, for valuation purposes, as indirect gifts of Marital Fund assets to GFLP's partners' capital accounts or as direct gifts of limited partnership interests;

(6) whether the value of a Smith Barney investment account ($102,139) is includable in decedent's gross estate under section 2033;

(7) whether decedent's estate is entitled to deduct administration expenses in excess of those already claimed and allowed under section 2053; and

(8) whether decedent's estate is entitled to deduct ad valorem tax of $3,367 under section 2053.

## FINDINGS OF FACT

### Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the supplemental stipulation of facts are incorporated herein by this reference. Decedent was domiciled in Tulsa, Oklahoma, at the time of her death, and her

estate is administered there.  The estate's personal representative, Pamela Powell (Ms. Powell or petitioner), resided in Tulsa, Oklahoma, when she petitioned the Court on behalf of the estate.

Decedent died on June 12, 1997, and was the surviving spouse of Sidney Gore, who died on January 25, 1995.  Decedent and Sidney Gore were married for 49 years and had two children, Michael Gore (Mr. Gore) and Ms. Powell, and one grandchild, AP, the son of Ms. Powell.

During his lifetime Sidney Gore was involved in the oil production business.  At the time of his death, the bulk of his assets consisted of investments in oil companies and in Government bonds.  Sidney Gore had lived a frugal life and had accumulated considerable wealth, but he did not share the details of his finances with his family members or discuss his financial matters with them.

Decedent did not work outside of the home and did not accumulate substantial assets of her own during her marriage.  Neither decedent nor her children participated in Sidney Gore's business activities or in the management of his investments, and they had little knowledge of his financial affairs.

Estate Plans of Sidney Gore and Decedent

On October 20, 1988, Sidney Gore executed a Declaration of Trust Creating the Sidney Gore Trust (Sidney Gore Trust

declaration), in which he appointed himself trustee and stated his intention to fund the trust with $100 and "all of the Properties, Assets and Securities described in 'Schedule A'".[4] The Sidney Gore Trust declaration further provided that Sidney Gore retained the power to revoke the Sidney Gore Trust and that he was entitled to all trust income during his life.

The Sidney Gore Trust declaration also provided that, upon Sidney Gore's death, decedent would become the successor trustee of the Sidney Gore Trust and that after debts, taxes, and administration costs had been paid, the trust would be divided into two shares or funds--the Sidney Gore Marital Fund (Marital Fund) and a credit shelter fund to be known as the Sidney Gore Family Fund (Family Fund). The Family Fund was to contain property in a dollar amount equal to that which could pass free of the Federal estate tax by reason of the unified credit, and the Marital Fund was to contain the balance of the Sidney Gore Trust assets.

With regard to the principal and income of the Marital Fund, the Sidney Gore Trust declaration provided, in pertinent part, as follows:

> (a) Commencing at my death and during the life of my Wife, the Trustees shall pay the income to my Wife in monthly or more frequent installments as may be convenient to her.

---

[4]Schedule A was not attached to the copy of the Sidney Gore Trust declaration in the record.

(b) The Trustees also shall pay to my Wife such amounts, without limitation, from the principal of the Marital Fund, as she from time to time may direct by writing filed with the Trustees, or if she is acting as a Co-Trustee hereunder by writing filed with the Trust Records, and copy thereof delivered to the Co-Trustee.

(c) In addition to the said payments, the Trustees may from time to time pay to my Wife such amounts from the principal of the Marital Fund, as they deem necessary for her support, maintenance, health and reasonable comfort, taking into consideration the standard of living to which she is accustomed at my death.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(e) My Wife shall have and is hereby granted the power to appoint the principal and any undistributed income, to any person exercisable only by a provision in the Last Will and Testament of my Wife expressly exercising said power under the right hereby granted.

(f) Upon the death of my Wife, the Trustees shall distribute the then remaining principal and undistributed income in the Marital Trust, to such appointee or appointees (including the Estate of my Wife), in such manner as my Wife may appoint by her Last Will and Testament, and, to the extent that my Wife shall fail validly to exercise said Power of Appointment, the principal and any accrued or undistributed income, shall be distributed to the Trustees of the Family Fund, to be administered and distributed as herein provided for the Family Fund.

All Payments made by the Trustees to my Surviving Wife shall be made first out of the Sidney Gore Marital Fund, both income and principal, until said Fund is completely exhausted. Thereafter, if necessary, payments may be made from the Family Fund.

With regard to the principal and income of the Family Fund, the Sidney Gore Trust declaration provided that, during the life of decedent:

    (a) The Trustees may, if the Marital Fund is exhausted, pay the income to my Wife, in monthly or more frequent installments as may be convenient to her.

    (b) In addition to the said payments, if the marital fund is exhausted, the Trustees may from time to time pay to my Wife such amounts from the principal of the Family Fund, as they deem necessary for her support, maintenance, health and reasonable comfort, taking into consideration the standard of living to which she is accustomed at my death.

The Sidney Gore Trust declaration further provided that after decedent's death, the lesser of $100,000 or one-fourth of the assets remaining in the Family Fund would be distributed to each of Mr. Gore and Ms. Powell, and the balance of the assets would be divided equally into two separate funds--the Michael Gore Fund and the Pamela M. Gore Fund.[5]

On October 20, 1988, Sidney Gore executed his Last Will and Testament. In his will, Sidney Gore appointed decedent as executrix, and he bequeathed all personal property to her. The will devised the residue of his estate to decedent, as the successor trustee of the Sidney Gore Trust, to be held and distributed in accordance with the Sidney Gore Trust declaration.

Also on October 20, 1988, decedent executed a Declaration of Trust Creating the Sylvia Gore Trust (Sylvia Gore Trust declaration), which contained provisions substantially identical to those of the Sidney Gore Trust declaration, and a Last Will

---

[5]We refer to Pamela M. Gore as Pamela Powell or Ms. Powell throughout this opinion.

and Testament, which contained provisions substantially identical to those of Sidney Gore's will. The Sylvia Gore Trust declaration named decedent as trustee of the Sylvia Gore Trust and provided that the trust would be funded with $100 and "all of the Properties, Assets and Securities described in 'Schedule A'".[6] The Sylvia Gore Trust declaration also provided that decedent retained the power to revoke the Sylvia Gore Trust and was entitled to all trust income during her life.

Several years later, on January 24, 1995, Sidney Gore met with his accountant, Cecilia Bowers, in the hospital where he was hospitalized. On several previous occasions, Ms. Bowers had discussed with Sidney Gore her belief that the Sidney Gore Trust was not funded.[7] At the January 24 meeting, Sidney Gore expressed to Ms. Bowers his concerns about preserving the wealth he had accumulated through his life's work, protecting his assets from waste, and conserving them for future generations. Sidney Gore also expressed to Ms. Bowers his concern about decedent's future needs. He wanted to ensure that decedent would be financially secure after his death and that his assets were made available to her for that purpose.

---

[6]Schedule A was not attached to the copy of the Sylvia Gore Trust declaration in the record.

[7]Neither party contends that the Sidney Gore Trust was not funded, and both parties assume, for purposes of this case, that the Sidney Gore Trust was funded at the time of his death.

After Sidney Gore's death on January 25, 1995, and in response to his concerns, Ms. Bowers first proposed the idea of a limited partnership to Ms. Powell and Mr. Gore and later discussed it with decedent. Ms. Bowers had little experience with family limited partnerships and had never recommended one to a client before she made the proposal to the Gore children, so she recommended that Ms. Powell, Mr. Gore, and decedent retain an attorney to further advise them about a limited partnership. Ms. Powell and Mr. Gore ultimately engaged the services of attorneys John L. Boyd and Jim Bishop.

On December 11, 1996, the Estate of Sidney Gore filed a General Inventory and Appraisement in the District Court for Tulsa County, State of Oklahoma (district court). The inventory reported the total value of Sidney Gore's estate as $4,568,204.

Formation of GFLP

On December 19, 1996, Ms. Powell and Mr. Gore executed a Certificate of Limited Partnership for GFLP (certificate), which they filed with the secretary of state of the State of Oklahoma. The certificate set forth the name of the partnership, designated John L. Boyd as its service agent, named Ms. Powell and Mr. Gore as the general partners, and provided that the partnership was to exist for 49 years and 12 days commencing on December 19, 1996.[8]

---

[8]Stipulation 22 erroneously states that the commencement date specified in the certificate is Dec. 26, 1996.

Although Ms. Bowers had consulted decedent about forming GFLP, decedent did not participate in its formation. On December 26, 1996, the secretary of state for the State of Oklahoma issued a formal certificate.[9]

On December 26, 1996, Ms. Powell and Mr. Gore executed the GFLP Partnership Agreement (partnership agreement). The partnership agreement provided that GFLP was formed for investment purposes and that profits and losses would be allocated in proportion to the capital accounts of the partners. With regard to initial capital contributions to GFLP, the partnership agreement provided, in part, the following:

> Each Partner shall make an initial contribution to the capital of the Partnership, simultaneously with the execution of this Agreement, in the amount shown on Schedule A. In consideration, each Partner shall be issued such number of units of Partnership interest ("Partnership Units") as is indicated on Schedule A, consisting of the number of units of General Partnership interest (each a "General Partnership Unit") and units of Limited Partnership interest (each a "Limited Partnership Unit") shown on Schedule A. Each Partnership Unit shall represent equivalent economic interests in the Partnership.

Schedule A to the partnership agreement named only Mr. Gore and Ms. Powell as general partners and did not list the names of any limited partners. Schedule A showed that Mr. Gore and Ms. Powell had contributed $500 each for a general partnership unit. In

---

[9]Respondent does not dispute that GFLP is a valid entity under Oklahoma law.

fact, neither Mr. Gore nor Ms. Powell made any capital contributions when the partnership agreement was executed.

Distributions From Sidney Gore's Estate

On December 30, 1996, the district court entered an Order for Partial Distribution in the Estate of Sidney Gore that provided for distribution of the following property to the Sidney Gore Trust:

Schedule A--Real Estate

(1) Mineral interest in
Henry Hill gas well                    (Henry Hill lease)

Schedule B--Stocks and Bonds

(2) 2,500 common shares of
Tenneco, Inc.                          (Tenneco)
(3) 3,000 common shares of
Mobil Corp.                            (Mobil)
(4) 6,000 common shares of
Chevron Corp.                          (Chevron)
(5) 15,000 common shares of
Exxon Corp.                            (Exxon)
(6) 3,600 common shares of
Amoco Corp.                            (Amoco)
(7) 200 common shares of
Texaco, Inc.                           (Texaco)
(8) 10,200 common shares of
Phillips Petroleum                     (Phillips)
(9) 12-year and 15-year State
of Israel savings bonds                (State of Israel bonds)
(10) Grand River Dam Authority
Oklahoma bond; 5.25-percent
interest, maturing on June 1,
2002, and held in a Paine
Webber account                         (GRDA bond No. 1)
(11) Grand River Dam Authority
Oklahoma bond; 6.8-percent
interest, maturing on June 1,
1997, and held in a Smith
Barney account                         (GRDA bond No. 2)

(12) 50 Grand River Dam Authority
     Oklahoma bonds; 5.2-percent
     interest, maturing on June 1,
     2000, and held by U.S. Trust
     Co.                                (GRDA bond No. 3)
(13) 10 U.S. Government savings
     bonds, series E                    (savings bonds)
(14) St. Francis Hospital bond          (St. Francis bond)
(15) Colonial tax-exempt
     mutual fund                        (Colonial Fund)

Schedule C--Cash and Certificates of Deposit (CDs)

(16) 17 $100 bills
(17) Boatmen's Bank checking            (Sidney Gore account
       account No. xx-xxxx-xx6478         No. 6478)
(18) Two Treasury notes                 (Treasury notes)
(19) Commercial Federal CD No.
       xxxxx10-2                        (Commercial Federal CD)
(20) Valley National CD                 (Valley National CD
       No. xxx48                          No. 1)
(21) Valley National CD                 (Valley National CD
       No. xxx09                          No. 2)
(22) Bank of Oklahoma CD
       No. xxx-xxxxx36                  (Bank of Okla. CD)
(23) State Bank CD No. xxxxx11          (State Bank CD No. 1)
(24) State Bank CD No. xxx51            (State Bank CD No. 2)

Schedule D--Tangible Personal Property

(25) Household furnishings
(26) Personal clothing
(27) Wedding band and watch

The Order for Partial Distribution did not specify how the property distributed to the Sidney Gore Trust was to be allocated as between the Marital Fund and the Family Fund. However, the Sidney Gore estate's Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, dated October 22, 1996, reported that the estate's assets were to be distributed as follows: (1) Decedent was to receive the marital home, Bank of

Oklahoma checking account No. xxxxxx6672 (joint account No. 6672), Social Security death benefit, household furnishings, personal items, car, and two individual retirement accounts, the cumulative value of which was in excess of $500,000; (2) the Family Fund was to receive cash of $542,000; and (3) the Marital Fund was to receive specific assets listed on pages 17-20 of the estate tax return, which included the assets referenced in schedules A, B, and C of the Order for Partial Distribution,[10] a Grand River Dam Authority Oklahoma bond bearing a 5.5-percent interest rate that matures on June 1, 2009, and allegedly was held in a Paine Webber account (GRDA bond No. 4),[11] a Grand River Dam Authority Oklahoma bond bearing a 5.0-percent interest rate that matured on June 1, 2001, and was held in the same Paine Webber account as GRDA bond No. 1 (GRDA bond No. 5), a Grand River Dam Authority Oklahoma bond bearing a 5.0-percent interest rate that matured on June 1, 2001, and was held in a Merrill Lynch account (GRDA bond No. 6), an individual retirement

---

[10]A Valley National CD No. xxx24 was listed on Schedule M, Bequests, etc., to Surviving Spouse, of the Sidney Gore estate's Form 706.  However, two Valley National CDs with different numbers and different maturity dates were included on the Order for Partial Distribution.

[11]It is unclear from the record whether this bond actually exists or whether Sidney Gore's estate confused it with another bond in reporting it on Form 706.  The only mention of this bond is in the Sidney Gore estate's Form 706; it was not referred to in any other documents in the record, including the Paine Webber account statement and the parties' valuation experts' reports.

account, and various dividends and accrued interest payments with respect to the assets mentioned in (3) above, the cumulative net value of which was in excess of $3,800,000. Sidney Gore's estate claimed a marital deduction of $4,411,359 on Form 706 for the property distributed to decedent and the Marital Fund. The Form 706 reported a taxable estate of $642,411.[12]

On October 8, 1997, the district court issued an Order Allowing Final Account, Determination of Heirship and Final Decree of Distribution in the Estate of Sidney Gore. This order authorized the distribution of GRDA bond No. 1, GRDA bond No. 5, and any other property not otherwise mentioned or distributed to Ms. Powell as successor trustee of the Sidney Gore Trust.[13]

Modification of Decedent's Estate Plan

On December 23, 1996, decedent executed a Uniform Durable Power of Attorney in which she designated Ms. Powell her

---

[12]The Form 706 for the Estate of Sidney Gore is the only documentary evidence in the record as to whether the assets enumerated in the Order of Partial Distribution dated Dec. 30, 1996, were distributed to the Sidney Gore Trust, or that the Marital Fund, in fact, was funded.

[13]The record does not disclose why both the Dec. 30, 1996, order and the final order of Oct. 8, 1997, authorized the distribution of GRDA bond No. 1 and why neither order specifically authorized the distribution of GRDA bond No. 4, if it existed, and GRDA bond No. 6. We shall assume, for purposes of this opinion, that the reference to "any other real or personal property not inventoried and appraised in this estate and not referred to herein" in the final order of Oct. 8, 1997, operated to authorize the distribution of GRDA bonds Nos. 4 and 6.

attorney-in-fact.  On January 3, 1997, decedent resigned as trustee of the Sylvia Gore Trust, and Ms. Powell became the successor trustee.  On January 8, 1997, decedent executed the following five documents in the presence of her attorneys and Ms. Powell:  First Amendment Restating the Declaration Creating the Sylvia Gore Trust (amendment); Last Will and Testament of Sylvia Gore;  Declaration Creating the Pamela M. Powell Irrevocable Trust (Pamela Powell Trust); Declaration Creating the Michael Gore Irrevocable Trust (Michael Gore Trust); and Exercise of Power and Irrevocable Assignment (assignment).

The Amendment

The amendment provided that "all the property in which I have an interest is from this date forward subject to the trust which I now restate whether such property is set forth in an attached schedule or is unscheduled, whether real or personal, tangible or intangible".[14]  The amendment also provided that decedent retained the power to revoke the Sylvia Gore Trust at any time, that decedent was entitled during her life to any amount of income or principal from the Sylvia Gore Trust she requested, and that, upon decedent's death, the remaining undistributed income and principal would be distributed equally to the Pamela Powell Trust and the Michael Gore Trust.  In

---

[14]No schedule or other description of property was attached to the copy of the amendment in the record.

addition, the amendment contained a clause entitled "SPECIFIC INVESTMENT", which provided that "I have or shall invest or direct investments of the assets subject to this trust in the Gore Family Limited Partnership."  The amendment appointed Ms. Powell trustee.

### The Pamela Powell and Michael Gore Trust Declarations

The Pamela Powell and Michael Gore Trust declarations contained substantially identical provisions.  Under their respective trust declarations, Ms. Powell and Mr. Gore were entitled during their lives to receive income from their trusts and such amounts of principal as they requested.  The declarations named the Trust Company of Oklahoma (TCO) trustee of the trusts.  The declarations directed TCO to distribute trust principal as necessary for the health, education, and maintenance of Ms. Powell, Mr. Gore, and any of their descendants but limited the total principal distributions that could be made from each trust to $100,000 in any year.  In addition, the declarations contained a clause entitled "SPECIFIC INVESTMENT", which provided as follows:

> Subject to the approval of the general partners, the Trustee is directed to invest the initial investment of $500 as a limited partner in the Gore Family Limited Partnership * * *  It is my intention to make further gifts to the Trustee of this trust as a limited partner of the aforesaid partnership.

Decedent's Last Will and Testament

    Decedent's January 8, 1997, will revoked her last will and testament of October 20, 1988, and appointed Ms. Powell personal representative.  Decedent's will provided that after her estate's expenses and taxes were paid, the residue of her estate, including all property over which she held a power of appointment at death, would be distributed to the trustee of the Sylvia Gore Trust.

    The Assignment

    The assignment provided, in pertinent part, as follows:

        The Sidney Gore Marital Trust provides, inter alia, that I, Sylvia Gore, the undersigned surviving spouse of Sidney Gore, am empowered to withdraw all or any portion of the assets of the Marital Trust.  I, therefore, on this 8th day of January, 1997, exercise the aforesaid power by withdrawing all those assets received or to be received by the Marital Trust.  Such withdrawals shall be effected as follows:

        1.   I hereby assign assets having a fair market value of $100,000 to the Trust Company of Oklahoma, Trustee of the Pamela M. Powell Irrevocable Trust and assets having a fair market value of $100,000 to the Trust Company of Oklahoma, Trustee of the Michael Gore Irrevocable Trust.  The aforesaid assets are to be administered and distributed pursuant to the terms of each respective trust.

        2.   I hereby assign the remainder of those assets received or to be received by the Marital Trust to the Gore Family Limited Partnership, the beneficial interest to be allocated as follows:

            (a)  An undivided one-third interest shall be credited to the capital account of Pamela M. Powell, Trustee of the Sylvia Gore Revocable Trust dated October 20, 1988, as amended;

(b)  An undivided one-third interest shall be credited to the capital account of the Trust Company of Oklahoma, Trustee of the Michael Gore Irrevocable Trust; and

(c)  An undivided one-third interest shall be credited to the capital account of the Trust Company of Oklahoma, Trustee of the Pamela M. Powell Irrevocable Trust.

I hereby authorized [sic] and empower Pamela M. Powell as my attorney-in-fact with all those powers granted to her by that certain Durable Power of Attorney dated December 23, 1996, to act in my behalf for the purpose of executing this Exercise of Power and Irrevocable Assignment.

The assignment did not identify or describe any specific assets to which it was to apply, and it is unlikely that decedent knew when she signed the assignment the specific assets that Sidney Gore and/or the Sidney Gore Trust owned.

Before her death, decedent did not transfer title to any assets in the Marital Fund to TCO to fund the gifts of $100,000 to each of the Michael Gore and Pamela Powell Trusts.[15]  After January 8, 1997, decedent did not execute any other documents confirming any transfer of assets pursuant to the assignment, reflecting any gifts of GFLP partnership interests, or documenting any sale or transfer of assets to GFLP.

_____

[15]In the estate tax notice of deficiency, respondent determined that the fair market value of GFLP was $4,997,280. This figure does not include the two $100,000 amounts assigned to the children's trusts that were reported as gifts on decedent's gift tax return.  However, respondent has not asserted an increased estate tax deficiency to reflect the estate tax on the $200,000.

Management of GFLP During Decedent's Life

From its formation in December 1996 through and including June 12, 1997, the date of decedent's death, GFLP did not operate a business or engage in any business or investment activity. During that same period, GFLP did not hold legal title to any Marital Fund assets other than a bank account opened in February 1997.

On January 30, 1997, Ms. Powell delivered 40 certificates, representing all of the Tenneco, Mobil, Chevron, Exxon, Amoco, and Texaco shares, 9,300 of the 10,200 shares of Phillips stock in the Marital Fund,[16] and 500 shares of Newport News Shipbuilding, Inc. stock (Newport News stock)[17] to TCO. Each of the 40 certificates delivered to TCO was registered to Sidney Gore, except the certificates for 8,000 shares of Exxon stock registered in the names of Sidney Gore and decedent as joint tenants. When she delivered the certificates to TCO, Ms. Powell

---

[16]Stipulation 100 states that certificates representing all of the shares of Phillips stock in the Marital Fund were delivered to TCO. However, Mr. Gore's estate tax return lists 10,200 shares of Phillips stock as a distribution to the Marital Fund. The record does not disclose what happened to the remaining 900 shares.

[17]The 500 shares of Newport News Shipbuilding, Inc. stock were omitted from both the Dec. 30, 1996, Order for Partial Distribution in the Estate of Sidney Gore and the retained Form 706 for Sidney Gore's estate. The parties have stipulated that the Newport News stock was distributed to the Sidney Gore Trust.

did not instruct TCO to reregister the shares in the name of GFLP.

On February 20, 1997, Ms. Powell and Mr. Gore, in their capacity as general partners of GFLP, entered into an Investment Management Agency Agreement (agency agreement) with TCO. The agency agreement stated in part the following: "[GFLP] hereby delivers to * * * [TCO] the assets described in 'Exhibit A', attached hereto and made a part hereof. Any additional assets deposited by * * * [GFLP] will also be held pursuant to this Agreement when accepted by * * * [TCO]."[18] The agency agreement further provided that TCO: (1) Shall safekeep, collect and receive income from, and invest or dispose of the assets deposited as directed by GFLP; (2) shall have the authority and discretion to sell or exchange any assets deposited by GFLP; (3) shall distribute income or principal upon the request of GFLP; and (4) shall periodically analyze the assets held.

On February 24, 1997, Mr. Gore contributed $500 to GFLP for his 1-percent general partnership interest, and on March 1, 1997, Ms. Powell contributed $500 for her 1-percent general partnership

_____

[18]No "Exhibit A" was attached to the copy of the agency agreement in the record.

interest.[19]  The funds to make the contributions came from decedent.

On February 25, 1997, decedent signed a $1,000 check made payable to TCO, which was delivered to TCO with instructions to treat the payment as a $500 contribution to GFLP on behalf of each of the Pamela Powell and Michael Gore Trusts.  On February 27, 1997, in response to decedent's request, TCO issued two $500 checks, representing the initial capital contributions by the Pamela Powell and Michael Gore Trusts for their 1-percent limited partnership interests, to GFLP.

On February 25, 1997, Ms. Powell opened a checking account for GFLP, account No. xx-xxxx-xx7045 (GFLP account No. 7045), with an initial deposit of $24,168.10.[20]  On March 3, 1997, Ms. Powell deposited $2,000, representing the capital contributions of Ms. Powell, Mr. Gore, the Pamela Powell Trust, and the Michael Gore Trust, into GFLP account No. 7045.  Additional deposits of $226,456.76 were made to GFLP account No. 7045 between February 25 and March 7, 1997.[21]

---

[19]The terms of the partnership agreement had required Ms. Powell and Mr. Gore to pay such amounts when they executed the partnership agreement on Dec. 26, 1996.

[20]This was the only GFLP bank account in existence during decedent's life.

[21]Ms. Bowers testified that decedent deposited a portion of the distributions from Sidney Gore's individual retirement accounts, on which decedent was a designated beneficiary, into
                                                    (continued...)

The funds deposited in GFLP account No. 7045 as of March 7, 1997, were expended as follows. On March 7, 1997, a wire transfer of $134,500 from GFLP account No. 7045 was made to Mr. Gore to enable him to purchase his home in Temecula, California.[22] On April 14 and 15, 1997, Ms. Powell wrote checks for $35,000 and $60,000, drawn on GFLP account No. 7045 and made payable to Sylvia Gore, which were then deposited into an account titled "Sylvia Gore, Trustee of Sidney Gore Trust", account No. xxxxxx0825 (trust account No. 0825).

TCO concluded that, as of April 25, 1997, GFLP was "not funded". TCO's records also show that TCO never received, on GFLP's behalf, any of the dividends paid with respect to the Marital Fund stocks for the first quarter of 1997.

On May 21, 1997, the Amoco, Tenneco, and Newport News stocks were reregistered from "Sidney Gore" to "Sylvia Gore, Trustee of the Sidney Gore Trust", and on June 5, 1997, the Chevron stock was similarly reregistered.[23] The Exxon, Mobil, Phillips, and

---

[21](...continued)
GFLP account No. 7045.

[22]Mr. Gore executed a deed that transferred the home to GFLP on Mar. 10, 1997, but made no cash payments of rent to GFLP. Although Ms. Bowers testified that rent payments were deducted from Mr. Gore's partnership distributions, the only documentary evidence of any rent payments is the reference to rent payments contained in Ms. Bowers's accounting records.

[23]Although the record is not entirely clear, Ms. Powell apparently signed stock powers on a date not disclosed by the
(continued...)

Texaco stocks were titled in Sidney Gore's name throughout decedent's life, except for 8,000 shares of Exxon stock which were registered in the names of Sidney Gore and decedent as joint tenants.[24]

During 1997, Ms. Powell deposited some but not all of the dividends paid on Marital Fund stocks for the first 6 months of 1997, into GFLP account No. 7045. None of the dividend checks issued with respect to Marital Fund stocks for the first 6 months of 1997 was made payable to GFLP.

On June 6, 1997, Ms. Powell also deposited into GFLP account No. 7045 $3,400 of interest paid on the Smith Barney investment account and $6,250 of interest paid on the Merrill Lynch account. On the deposit date, the Smith Barney and Merrill Lynch accounts were still titled in decedent's name, not GFLP's.

Management of Decedent's Finances After GFLP Was Formed

Decedent suffered from Parkinson's disease and had been admitted to the hospital for disorientation and decreased levels of consciousness on several occasions after Sidney Gore's death. From December 1996 until her death, decedent had to have private

---

[23](...continued)
record but after she delivered the Marital Fund stocks to TCO's vault.

[24]In a letter from TCO to John Boyd dated Sept. 15, 1997, TCO implied that the matter of transferring stocks has "lied dormant within TCO", and in a letter to the Oklahoma Tax Commission dated Jan. 8, 2002, TCO stated that it "was remiss in its timely transfer of the assets to GFLP".

home health care providers.  During 1997, Ms. Powell shopped for decedent's groceries and medications and paid decedent's bills.

From January 8, 1997, until decedent's death, Ms. Powell withdrew funds for decedent's personal living expenses from several bank accounts titled in decedent's name or in the name of one of the trusts.  Throughout that same period, Ms. Powell deposited into those bank accounts dividends and interest paid with respect to stocks, bonds, and other assets held in the Marital Fund, which allegedly had been assigned to GFLP.  For example, decedent maintained a trust checking account for the Sidney Gore Trust, trust account No. 0825, in the name of "Sylvia Gore, Trustee of the Sidney Gore Trust, Pamela Powell", into which Ms. Powell[25] deposited some but not all of the dividends paid on Marital Fund stocks and distributions from GFLP as follows:[26]

---

[25]Decedent remained the trustee of the Sidney Gore Trust from the time she executed the assignment until she died.

[26]Ms. Powell also deposited $2,472.13, which appears to be interest paid on the Commercial Federal CD, into trust account No. 0825.  However, the only evidence of this is the word "Commercial" that is handwritten on the check line of the deposit slip, and there are no other documents on record to corroborate that interest was paid on this CD in 1997.

| Date of deposit | Payor | Amount |
|---|---|---|
| Mar. 14, 1997 | Exxon | $6,320 |
| Mar. 14, 1997 | Exxon | 5,530 |
| Mar. 14, 1997 | Mobil | 3,180 |
| Mar. 14, 1997 | Tenneco | 750 |
| Mar. 14, 1997 | Texaco | 170 |
| Apr. 14, 1997 | GFLP | 35,000 |
| Apr. 15, 1997 | GFLP | 60,000 |
| Total | | 110,950 |

From December 23, 1996, through June 12, 1997, Ms. Powell used trust account No. 0825 to pay decedent's personal expenses in the following amounts:

| Description of expense | Amount |
|---|---|
| Decedent's home health care providers | $28,610.00 |
| Decedent's medicine, doctor's bills, and other medical expenses | 2,145.95 |
| Decedent's groceries | 4,187.08 |
| Decedent's utilities, phone, and home maintenance and insurance | 7,614.70 |
| Entertainment and gifts on behalf of decedent | 32,337.73 |
| Decedent's estimated State and Federal individual income taxes | 100,000.00 |
| Total | 174,895.46 |

Neither Ms. Powell nor decedent wrote any checks to GFLP from trust account No. 0825.

Decedent and Sidney Gore had maintained a joint checking account, joint account No. 6672, in the name of "Sidney Gore or Sylvia Gore", which remained open throughout 1997. On January 21, 1997, Ms. Powell deposited $5,481.03, representing the proceeds from the redemption of Colonial Fund shares, into joint account No. 6672. From January 13 through June 12, 1997, Ms. Powell wrote a check for $6,500 payable to decedent and another

for $1,000 payable to herself from joint account No. 6672. Neither Ms. Powell nor decedent wrote any checks to GFLP from joint account No. 6672 from January 13 through June 12, 1997.

Decedent and Pamela Powell also maintained a joint checking account, account No. xxx4495 (decedent's account No. 4495), in the name of "Sylvia Gore or Pamela Powell", which remained open throughout 1997. From January through June 12, 1997, Ms. Powell deposited decedent's Social Security payments totaling $8,022 into account No. 4495.

After decedent died, Ms. Powell continued to handle decedent's finances and to pay her remaining expenses. Ms. Powell deposited the following Marital Fund assets into decedent's account No. 4495:[27]

| Date | Source of Funds | Amount |
| --- | --- | --- |
| June 16, 1997 | Proceeds of Smith Barney investment account | $102,139.01 |
| July 7, 1997 | Proceeds of Valley National CD No. 1 | 20,612.90 |
| July 7, 1997 | Interest accrued on Valley National CD No. 1 | 1,185.24 |
| July 28, 1997 | Proceeds of Valley National CD No. 2 | 24,907.99 |
| July 28, 1997 | Interest accrued on Valley National CD No. 2 | 1,457.12 |
| Total | | 150,302.26 |

---

[27]After June 12, 1997, Ms. Powell did not write any checks on, or deposit any funds into either joint account No. 6672 or trust account No. 0825. Ms. Powell closed trust account No. 0825 on Aug. 24, 1997.

From June 12 through December 1997, Ms. Powell paid more than $100,000 toward decedent's taxes, utilities, funeral expenses, administrative expenses, and other expenses related to decedent's home from decedent's account No. 4495. In addition, Ms. Powell made $36,000 in "loans from the estate" to herself and Mr. Gore from decedent's account No. 4495. Ms. Powell did not write any checks from decedent's account No. 4495 to GFLP during 1997.

On or about September 4, 1997, Ms. Powell opened account No. xxx3408 in the name of "The Estate of Sidney Gore, Pamela Powell, Personal Representative" (Sidney Gore estate account No. 3408). Ms. Powell made the following deposits to Sidney Gore estate account No. 3408:

| Date of deposit | Description | Amount |
| --- | --- | --- |
| Sept. 4, 1997 | Phillips dividend | $3,468 |
| Sept. 4, 1997 | Proceeds of Bank of Okla. CD | 100,000 |
| Sept. 11, 1997 | Mobil dividend | 3,180 |
| Total | | 106,648 |

On September 11, 1997, Ms. Powell wrote checks from Sidney Gore estate account No. 3408 totaling $3,900 for Mr. Gore's[28] 1997 estimated local and Federal income taxes. Ms. Powell did not write any checks from Sidney Gore estate account No. 3408 to GFLP through January 6, 1998.

---

[28]Mr. Gore refers to Michael Gore.

Management of GFLP After Decedent's Death

As of June 12, 1997, GFLP did not hold title to any of the Marital Fund assets. The Mobil, Exxon, Texaco, and Phillips stocks were registered to Sidney Gore, except for 8,000 shares of Exxon, which were registered to Sidney Gore and decedent as joint tenants; the Amoco, Tenneco, Newport News, and Chevron stocks were registered to "Sylvia Gore, Trustee of the Sidney Gore Trust"; decedent's name remained on the Smith Barney account, Merrill Lynch account, Valley National CDs No. 1 and No. 2, and State Bank CD No. 2; Sidney Gore's name remained on the Paine Webber investment account, Colonial Fund, State Bank CD No. 1, Bank of Okla. CD, GRDA bond No. 3, and the Henry Hill lease.[29] Title to the other Marital Fund assets remained unchanged throughout 1997.

On September 18, 1997, GFLP finally delivered to TCO stock certificates for those Marital Fund stocks that had been reregistered in the name of GFLP. In December 1997, TCO finally began to receive dividend checks for dividends on Marital Fund stocks that had been reregistered to GFLP. A TCO report dated as of April 25, 1998, listed only those stocks that had been

---

[29]The record does not disclose the owner's name, as of June 12, 1997, of the State of Israel bonds, the savings bonds, GRDA bond No. 4 (if it exists), the Treasury notes, and the Commercial Federal CD. TCO records clearly indicate that TCO never held title to these assets on behalf of GFLP, and there is no other credible evidence on record that GFLP held title to these assets.

reregistered to GFLP and 90,600 shares of Dreyfus Treasury Prime (purchased on November 10, 1997) as GFLP assets under management.

The process of transferring title to Marital Fund assets to GFLP continued through at least 2000.[30]

GFLP Accounting Records

In October 1997, more than 9 months after GFLP was formed and 4 months after decedent died, Ms. Bowers created partnership accounting records that purported to show (1) transfers of assets from decedent to GFLP; (2) sales of decedent's assets to GFLP, Ms. Powell, Mr. Gore, and the Pamela Powell and Michael Gore Trusts; (3) deposits made to GFLP account No. 7045, trust account No. 0825, and joint account No. 6672; and (4) amounts paid for decedent's expenses out of GFLP's assets offset by amounts allegedly owed to decedent by GFLP. However, Ms. Bowers did not date any of the individual transactions she recorded as journal entries. Instead, she set up the records to correspond to transactions that should have occurred upon the formation of GFLP and the execution of the assignment.

---

[30]More recent account statements show that, as of June 30, 1999, the Colonial Fund was still titled to "Sidney Gore", and as of June 2000, the Paine Webber investment account had been retitled to "Pamela Powell, Successor Trustee of the Sidney Gore Family Fund Trust". As recently as May 2000, TCO had written a letter to Ms. Powell requesting that she sign documents to transfer the Merrill Lynch account to GFLP, and on Aug. 27, 2000, Ms. Powell finally transferred the Henry Hill lease to GFLP.

The GFLP accounting records prepared by Ms. Bowers purport to show that decedent transferred the following Marital Fund assets to GFLP: Amoco, Chevron, Exxon, Mobil, Texaco, Tenneco, Phillips, and Newport News stocks; Henry Hill lease; Merrill Lynch account; Paine Webber account; Colonial Fund; Smith Barney account; US Trust account; one of the two Treasury notes; Sidney Gore account No. 6478; State Bank CDs No. 1 and No. 2; and Bank of Okla. CD. In addition, Ms. Bowers listed Sidney Gore estate account No. 3408, joint account No. 6672, and trust account No. 0825 as GFLP assets.

The accounting records also purport to show that after decedent executed the assignment, decedent allegedly sold the Commercial Federal CD, the savings bonds, a Valley National CD, and one of the Treasury notes to GFLP in exchange for a note payable to her from GFLP. Ms. Bowers then made adjusting journal entries purporting to record the use of GFLP assets to pay decedent's personal expenses and a corresponding reduction of the note payable owed to decedent. However, GFLP did not execute any promissory notes payable to decedent from December 1996 through December 1997.

The accounting records also purport to document the existence of various notes payable to GFLP from the Sylvia Gore, Pamela Powell, and Michael Gore Trusts. However, neither

decedent nor any of the GFLP partners executed any notes payable to GFLP from December 1996 through December 1997.

After decedent died, Ms. Powell continued to use GFLP account No. 7045 to pay some of decedent's and Mr. Gore's personal expenses. In October 1997, checks in excess of $700 drawn on GFLP account No. 7045 and signed by Mr. Gore were issued to pay property taxes on Mr. Gore's California home. In December 1997, Ms. Powell wrote additional checks from GFLP account No. 7045 to pay expenses related to decedent's home.

On December 8, 1997, Ms. Powell opened a money market savings account on behalf of GFLP at Nations Bank, account No. xx-xxxx-xx6020 (GFLP account No. 6020), with an initial deposit of $5,000 from GFLP account No. 7045. On July 11, 2000, Ms. Powell wrote a check for $192,800 from GFLP account No. 6020, payable to the U.S. Treasury, for decedent's Federal estate taxes.[31]

The Estate and Gift Tax Returns

On March 15, 1998, decedent's estate filed Form 709, U.S. Gift (and Generation-Skipping Transfer) Tax Return (gift tax return). Ms. Bowers prepared the gift tax return. The gift tax return reported that decedent had made the following gifts on January 8, 1997: (1) $102,500 cash to the Pamela Powell Trust;

_____

[31]The record does not indicate the source of the funds on deposit in GFLP account No. 6020, except for the $5,000 transferred from GFLP account No. 7045.

(2) $110,500 cash to the Michael Gore Trust; (3) a 1-percent general partnership interest in GFLP to the Pamela Powell Trust, valued at $34,627; (4) a 1-percent general partnership interest in GFLP to the Michael Gore Trust, valued at $34,628; (5) a 32-percent limited partnership interest in GFLP to the Michael Gore Trust, valued at $503,834; and (6) a 32-percent limited partnership interest in GFLP to the Pamela Powell Trust, valued at $503,834. Ms. Bowers relied solely on the assignment to conclude that decedent had made completed gifts on January 8, 1997.

Ms. Bowers relied on a valuation opinion letter dated February 17, 1997, from K. Scott Sallee of Baird, Kurtz & Dobson to calculate the value of the gifts reported on Form 709.[32] In the opinion letter, Mr. Sallee concluded that, after subtracting the $200,000 that was supposed to have been transferred to the Pamela Powell and Michael Gore Trusts, the total value of GFLP was $4,266,627.[33] Mr. Sallee then applied a combined discount for lack of control and marketability of 55 percent to compute an "adjusted aggregate nonmarketable and noncontrolling" value for

_____

[32]Each page of the valuation opinion attached to Form 709 was stamped with the following: "Preliminary Draft For Discussion Purposes Only".

[33]Although the funds to complete the gifts of $100,000 to each of the Pamela Powell and Michael Gore Trusts were never transferred from the Marital Fund to TCO, respondent has not argued that these gifts were incomplete.

GFLP of $1,919,982.[34]  Ms. Bowers then applied an additional discount in calculating the value of decedent's alleged gifts of limited partnership interests to her children reported on Form 709.

On October 19, 1998, the estate filed Form 706.  Ms. Bowers prepared the Form 706, which reported a gross estate of $1,776,893, deductions of $395,446, and a taxable estate of $1,381,447.  The Form 706 reported that decedent owned a "one-third interest" in GFLP, that the partnership interest had a book value of $1,424,908,[35] and that the partnership interest had a fair market value, of $740,036.[36]  On Schedule C, Mortgages, Notes, and Cash, of Form 706, the estate listed a $46,664 note payable to decedent from GFLP as an asset of the estate.  On Schedule K, Debts of the Decedent, and Mortgages and Liens, of

---

[34]Mr. Sallee stated in his opinion letter that interests in GFLP were held as follows:  Ms. Powell and Mr. Gore each held a 1-percent general partnership interest, decedent held a 34-percent limited partnership interest, and the Pamela Powell and Michael Gore Trusts each held a 32-percent limited partnership interest.  However, Mr. Sallee's description of decedent's limited partnership interest was incorrect; decedent held a 32.667-percent limited partnership interest.

[35]In preparing the tax return, Ms. Bowers described decedent's limited partnership interest as a "one-third interest", rather than a 32.667-percent interest.

[36]In calculating the value of decedent's limited partnership interest in GFLP, Ms. Bowers adjusted the total fair market value of GFLP stated in the valuation opinion because Mr. Sallee had based his opinion on the asset values reported on Sidney Gore's estate tax return.

Form 706, the estate deducted $1,543 for real estate taxes owed on decedent's home.

Respondent's Determinations

On September 26, 2001, respondent issued a notice of deficiency with respect to the gift tax return, in which he advanced two alternative positions. Respondent determined that the transfer of the Marital Fund assets was an indirect gift of one-third of the assets to Ms. Powell and one-third of the assets to Mr. Gore. Respondent valued each indirect gift at $1,479,514, the fair market value of one-third of the Marital Fund assets. Alternatively, respondent disallowed the discount that was applied in valuing the partnership interests transferred to the Pamela Powell and Michael Gore Trusts and valued each gift at its fair market value, which respondent determined to be $1,479,514, rather than $503,834 as shown on the gift tax return. Respondent also included a gift of $1,700 cash to Ms. Powell and a gift of $870 cash to Mr. Gore.[37]

On September 26, 2001, respondent issued a separate notice of deficiency with respect to the estate tax return, in which he advanced two alternative positions. Respondent included the fair market value of GFLP ($4,977,280) in decedent's taxable estate under sections 2036 and/or 2038 and reduced the taxable estate by

[37]Petitioner has not contested respondent's determination to increase decedent's taxable gifts by $1,700 and $870, and these amounts are not at issue in this case.

$740,036, the discounted value of decedent's limited partnership interest in GFLP reported on the estate tax return. Alternatively, respondent disallowed the discount for lack of control and marketability that was applied in valuing decedent's limited partnership interest for estate tax purposes and increased the taxable estate by the difference between the undiscounted fair market value of that partnership interest ($1,665,760) and the discounted value reported on the estate tax return ($740,036).

In conjunction with respondent's alternative position and the gift tax deficiency determined separately, respondent increased the value of the gross estate by the amount of additional gift tax due on the undiscounted fair market values of the limited partnership interests decedent allegedly gave to the Pamela Powell and Michael Gore Trusts and allowed those amounts as deductions. Under either alternative, respondent included $102,139, representing the value of the Smith Barney account, in the gross estate under section 2033 and disallowed the estate's deduction of $1,543 for ad valorem tax on decedent's home.[38]

---

[38]Respondent's computation of the estate tax deficiency erroneously omits the additional tax owed as a result of the disallowed deduction of $1,543 for real estate taxes.

Tax Court Pleadings

Petitioner timely petitioned this Court for redetermination of respondent's estate tax and gift tax determinations. Respondent subsequently moved for leave to file an amendment to his answer in the estate tax case (docket No. 468-02). In the motion, respondent asserted as an alternative to the primary and alternative positions taken in the estate tax notice of deficiency that the purported transfers of Marital Fund assets by decedent "did not actually occur or were incomplete for gift tax purposes at the time of decedent's death" (the incomplete transfer argument). Respondent also asserted that petitioner is not prejudiced by his incomplete transfer argument because respondent bears the burden of proof as to the incomplete transfer argument, and the same facts relevant to respondent's other arguments are relevant to the incomplete transfer argument. Petitioner did not object to respondent's motion, and we granted the motion. Respondent's amendment to answer, alleging that the transfers of Marital Fund assets to GFLP were not made or were incomplete for gift tax purposes as of decedent's death, was filed on September 5, 2002.

OPINION

I. Burden of Proof

Generally, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving them

incorrect.  Rule 142(a)(1); <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). However, the Commissioner bears the burden of proof with respect to any new matter pleaded in the answer.  See Rule 142(a)(1). Respondent concedes that he has the burden of proof on the issue of whether decedent's alleged transfer of Marital Fund assets to GFLP was an incomplete transfer, because respondent asserted this alternative theory in an amendment to his answer.

With respect to the remaining issues, petitioner has not argued that section 7491 applies, nor has petitioner established that the requirements of section 7491(a) have been met.[39] Consequently, we conclude that section 7491(a) does not shift the burden of proof to respondent on the remaining issues.  We note, however, that our conclusions are based upon the preponderance of the evidence and do not depend upon any allocation of the burden of proof.

---

[39]Before trial, petitioner filed a motion to shift burden of proof to respondent but did not assert that sec. 7491 applies. Rather, petitioner argued that respondent's determinations were arbitrary and excessive, on the basis of alleged errors in the notices of deficiency and respondent's reliance on several alternative theories in the case.  At the beginning of the trial, we denied the motion without prejudice to petitioner's right to raise burden of proof issues in the posttrial briefs.  Petitioner did not raise any burden of proof issues in the briefs, and consequently, we deem petitioner to have abandoned the arguments regarding the burden of proof.

II.  Whether Respondent Has Raised a New Issue on Brief

Respondent asserts for the first time on brief in conjunction with his incomplete transfer argument that the values of the Marital Fund assets are includable in decedent's gross estate under section 2033 or section 2041(a)(2).  Petitioner contends that respondent's section 2041(a)(2) argument is a new issue that we should decline to decide.

A party may not raise an issue for the first time on brief if the new issue surprises and prejudices the opposing party. Smalley v. Commissioner, 116 T.C. 450, 456 (2001) (citing Seligman v. Commissioner, 84 T.C. 191, 198-199 (1985), affd. 796 F.2d 116 (5th Cir. 1986)).  In evaluating whether the opposing party will suffer prejudice, we must consider the degree to which the opposing party is surprised by the new issue and the opposing party's need for additional evidence to respond to the new issue. Pagel, Inc. v. Commissioner, 91 T.C. 200, 212 (1988), affd. 905 F.2d 1190 (8th Cir. 1980).  Furthermore, a party may not rely upon a new theory unless the opposing party has been provided with fair warning of the intention to base an argument upon that theory.  Id. at 211-212. "Fair warning" means that the taxpayer's ability to prepare its case was not prejudiced by the Commissioner's failure to give notice, in the notice of deficiency or in the pleadings, of his intention to rely on a particular theory.  Id.

Although respondent did not refer to section 2041(a)(2) in the notices of deficiency, pleadings, or trial memoranda, or at trial, we disagree that respondent has raised a new issue. Regardless of which Code section respondent relies upon to include the values of the property in decedent's gross estate, the issue before us remains whether the values of the assets decedent allegedly transferred before her death are includable in her gross estate. Both section 2033 and section 2041(a)(2) operate to include property in a decedent's gross estate. The sections differ in that they apply to, and operate on, different property interests of a decedent. Our conclusion as to which section applies will depend upon, and flow from, our conclusion regarding the types of property interests decedent held on the date of her death.

Even if we were to conclude that respondent's reliance on section 2041(a)(2) is a new issue, however, we would still allow respondent to rely on that Code section. Because the Sidney Gore Trust declaration allegedly granted decedent a general power of appointment over the Marital Fund assets, respondent's current reliance on both sections 2033 and 2041(a)(2) should not cause surprise or prejudice to petitioner.[40] Moreover, petitioner is

---

[40]Although respondent argues on brief that the Sidney Gore Trust did not grant decedent a general power of appointment over Marital Fund assets within the meaning of sec. 2041(a), it appears that decedent did have such a power. See, e.g., Estate
(continued...)

not required to introduce any additional or different evidence than petitioner already has introduced to prove that the values of the Marital Fund assets should not be included in decedent's gross estate under section 2041(a)(2). The record already contains the necessary evidence for us to decide whether decedent transferred her interest in Marital Fund assets to GFLP or to its partners before her death and, if she did not, whether decedent held a general power of appointment over Marital Fund assets on the date of her death. As a result, we will consider respondent's argument regarding the application of section 2041(a)(2) as necessary.

III. <u>Whether Decedent Completed Transfers of Marital Fund Assets Before Her Death</u>

A. <u>The Alleged Withdrawal and Transfers</u>

On January 8, 1997, decedent executed an assignment that provided for the withdrawal of all of the assets from the Marital Fund and for the following transfers of Marital Fund assets:

1. The transfer of Marital Fund assets having a value of $100,000 to the Pamela Powell Trust for no consideration;

---

[40](...continued)
of Kurz v. Commissioner, 101 T.C. 44 (1993), supplemented T.C. Memo. 1994-221, affd. 68 F.3d 1027 (7th Cir. 1995). In addition, respondent's position on brief conflicts with the admission made in his answer in docket No. 467-02 that "the Sidney Gore revocable trust provided for a marital trust, as to the principal of which decedent, Sylvia Gore, had a general power of appointment."

2.  the transfer of Marital Fund assets having a value of $100,000 to the Michael Gore Trust for no consideration;

3.  the transfer of the balance of the Marital Fund assets to GFLP to be allocated equally to the capital accounts of GFLP's three limited partners:  the Sylvia Gore Revocable Trust, the Michael Gore Trust, and the Pamela Powell Trust.[41] Because the parties disagree regarding whether the alleged transfer to GFLP was completed before decedent died on June 12, 1997,[42] we must first decide whether decedent effectively withdrew the Marital Fund assets from the Marital Fund and, if she did, whether decedent completed any transfers of Marital Fund assets during her lifetime.

B.  The Parties' Arguments

Petitioner argues that decedent's execution of the assignment on January 8, 1997, was sufficient under Oklahoma law to withdraw all of the Marital Fund assets from the Marital Fund

---

[41]Petitioner argues in petitioner's posttrial briefs that, contrary to the wording of the assignment, the assignment resulted in decedent's transferring all of the Marital Fund assets to GFLP in exchange for a 98-percent limited partnership interest.  Petitioner contends that decedent then made gifts of GFLP limited partnership interests to decedent's children's trusts.  We find no credible evidence in the record to support petitioner's construction of the assignment and petitioner's description of the transfer the assignment allegedly effected, and we do not discuss this aspect of petitioner's arguments further.

[42]Respondent does not challenge the status of the alleged transfers to the children's trusts as completed gifts.

and to complete the above-described transfers. Respondent contends that decedent's execution of the assignment did not effect a withdrawal of Marital Fund assets from the Marital Fund pursuant to her power of withdrawal under the Sidney Gore Trust. Alternatively, respondent contends that, even if the assignment qualified as a valid exercise of decedent's power to withdraw, the simple act of executing the assignment, without more, was not sufficient under Oklahoma law to complete the transfers described in the assignment. Respondent further contends that decedent did not transfer title to, or signature authority over, any of the Marital Fund assets before her death on June 12, 1997, that decedent never delivered the Marital Fund assets to GFLP, and that decedent never released dominion and control over the Marital Fund assets during her lifetime. Respondent alleges that decedent continued to treat the Marital Fund assets (and the income therefrom) as her property during her lifetime.

C. Decedent's Alleged Withdrawal of Marital Fund Assets on January 8, 1997

In order to apply the appropriate Federal tax laws, we must first determine what property interests decedent owned on the date of her death. Because State law determines whether a taxpayer has a property interest or right, we must examine the law of the State of Oklahoma to ascertain whether decedent had a property interest in the Marital Fund assets on the date of her death and, if so, the nature of that interest. See Morgan v.

<u>Commissioner</u>, 309 U.S. 78, 80 (1940) (State law creates legal interests and rights, and Federal tax law determines the proper tax treatment of those interests or rights); <u>Estate of Davenport v. Commissioner</u>, 184 F.3d 1176, 1182 (10th Cir. 1999) (quoting <u>United States v. Irvine</u>, 511 U.S. 224, 238 (1994)), affg. T.C. Memo. 1997-390.

We begin our analysis with the assignment,[43] the document that petitioner contends accomplished the withdrawal of the Marital Fund assets and the transfer of those assets to the trusts of decedent's children and to GFLP.  We examine Oklahoma law to ascertain the effect of the assignment.  See <u>Morgan v. Commissioner</u>, <u>supra</u> at 80.

Under Oklahoma law, an assignment is "'an expression of intention by one that his rights shall pass to and be owned by another.'"  <u>Johnson v. Schick</u>, 882 P.2d 1059, 1061 (Okla. 1994) (quoting <u>Hoffman v. Barnett</u>, 178 P.2d 89, 90 (Okla. 1946)).  An assignment may be a legal assignment that relates to a "thing in being", or it may be an equitable assignment that relates to contingent interests, expectancies, and things potential. <u>Hoffman v. Barnett</u>, <u>supra</u> at 91.  A valid assignment is

---

[43]Although the same disturbing informality characterized transactions involving Sidney Gore, respondent concedes that "certain stock was distributed to the Sidney Gore Trust as a marital bequest to decedent."  In other words, respondent does not contest that there was a qualifying transfer into the Sidney Gore Trust and that the Marital Fund was in existence.

enforceable under Oklahoma law.[44]  <u>Union Life Ins. Co. v. Priest</u>, 694 F.2d 1252, 1255-1256 (10th Cir. 1982).

Respondent acknowledges the enforceability of an assignment under Oklahoma law.  Respondent argues, however, that the relevant issue is not the assignment's enforceability but whether the assignment effected a withdrawal of Marital Fund assets from the Sidney Gore Trust.

The estate planning on behalf of both Sidney Gore and decedent reflects a remarkable and persistent pattern of informality and inaction that makes any decision regarding what actually took place a difficult one.  Both Sidney Gore and decedent executed wills and trust agreements before they died, but they never actually transferred any assets into their trusts before their deaths.  Respondent has apparently accepted for purposes of this proceeding that, by reason of Sidney Gore's death and the distribution order, Sidney Gore's trust was funded, that his trust included a Marital Fund, and that decedent had a power to withdraw Marital Fund assets during her lifetime.  Respondent argues, however, that decedent's execution of the assignment without more was insufficient to withdraw the Marital Fund assets from the Sidney Gore Trust.

---

[44]In order for an equitable assignment to be enforceable under Oklahoma law, the equitable assignee must have furnished consideration to the assignor.  See <u>Johnson v. Schick</u>, 882 P.2d 1059, 1061 (Okla. 1994).

Although we can certainly understand why respondent makes this argument, we shall reject it. Decedent's execution of the assignment combined with her exercise of dominion and control over the Marital Fund assets after January 8, 1997, and her use of Marital Fund assets after she executed the assignment convinces us that decedent intended to withdraw the Marital Fund assets on January 8, 1997, and that she actually did so before she died on June 12, 1997.

D. Decedent's Alleged Transfers of Marital Fund Assets

Petitioner argues that decedent's execution of the assignment on January 8, 1997, also effected transfers of Marital Fund Assets to GFLP. Respondent argues that the assignment did not result in a completed transfer to GFLP that satisfies the requirements for valid inter vivos gifts under Oklahoma law.

All of the alleged transfers described in the assignment, except perhaps one, are transfers for no consideration; i.e, gifts. The only alleged transfer that may not be a gift is the alleged transfer of Marital Fund assets to GFLP. With respect to this alleged transfer, petitioner argues that the transfer was a bona fide sale for an adequate and full consideration in money or money's worth within the meaning of section 2036(a), and respondent argues that it was not. For purposes of this part of our analysis, we focus only on whether decedent's execution of the assignment resulted in a completed transfer of property to

GFLP and not on whether there was consideration for the alleged transfer to GFLP.

The requirements for a valid inter vivos gift under Oklahoma law are: (1) Donative intent; (2) actual delivery of the subject matter of the gift; (3) the relinquishment by the donor of all ownership, dominion, and control over the subject matter of the gift; and (4) acceptance of the gift by the donee. Estate of Davenport v. Commissioner, supra at 1183, 1186; Stinchcomb v. Stinchcomb, 674 P.2d 26, 30 (Okla. 1983); Frazier v. Okla. Gas & Elec. Co., 63 P.2d 11, 13 (Okla. 1936). The transfer by gift must be "gratuitous and irrevocable and go into immediate and absolute effect". Fox v. Kramer (In re Estate of Estes), 983 P.2d 438, 445 (Okla. 1999); Courtney v. First Natl. Bank, 569 P.2d 458, 460 (Okla. 1977); Davis v. Natl. Bank of Tulsa, 353 P.2d 482, 486 (Okla. 1960). In order to establish an inter vivos transfer by gift after the death of the alleged donor, the proponent of the gift must introduce evidence that is "clear, explicit, and convincing as to every element." Fox v. Cramer (In re Estate of Estes), supra at 445; see also Stinchcomb v. Stinchcomb, supra at 30; Shepherd v. Wood (In re Estate of Griffin), 599 P.2d 402, 404 (Okla. 1979); Davis v. Natl. Bank of Tulsa, supra at 486; Barry v. Phillips, 329 P.2d 1042, 1043 (Okla. 1958); Ratcliff v. Lee, 192 P.2d 843, 845 (Okla. 1948).

We begin our analysis of the alleged property transfers by examining whether decedent relinquished all incidents of ownership, dominion, and control over the Marital Fund assets when she executed the assignment on January 8, 1997.

The Marital Fund assets consisted primarily of stocks, bonds, and bank and investment accounts. Under Oklahoma law, the owner of stock is presumed to be the person in whose name shares of stock are registered or to whom stock certificates are issued. Davis v. Natl. Bank of Tulsa, supra at 483; Frazier v. Okla. Gas & Elec. Co., supra at 14; Okla. State Bank of Ada v. Cole, 38 P.2d 914, 916 (Okla. 1934). If a financial institution holds funds in an account registered to a customer, a presumption arises under Oklahoma law that the funds are owned by the customer whose name appears on the account. Barry v. Phillips, supra at 1045; Taliaferro v. Reirdon, 99 P.2d 500, 503 (Okla. 1940); Hastings v. Hugo Natl. Bank, 197 P. 457 (Okla. 1921).

As of June 12, 1997, either decedent's name or Sidney Gore's name appeared on the stock certificates of all stocks included in the Marital Fund and on most, if not all, of the other assets in the Marital Fund.[45] The record is devoid of any credible

---

[45]We cannot unequivocally state that "all" assets of the Marital Fund property were titled to decedent or Sidney Gore because the record does not establish in whose name, if any, the State of Israel bonds, savings bonds, Treasury notes, Commercial Federal CD, and GRDA bond No. 4 were titled or registered during 1997.

evidence that GFLP held legal title to <u>any</u> assets of the Marital Fund when decedent died.

Petitioner argues, however, that decedent's failure to transfer legal title to Marital Fund assets pursuant to the assignment was immaterial because legal title is only prima facie evidence of ownership. Although the transfer of legal title is not an essential element of an inter vivos gift under Oklahoma law, the presumption under Oklahoma law that ownership lies with the person holding legal title to an asset can be overcome only by evidence that the donor delivered, or otherwise parted with dominion and control over, the subject matter of the gift. <u>Estate of Davenport v. Commissioner</u>, <u>supra</u> at 1185-1186; <u>Davis v. Natl. Bank of Tulsa</u>, <u>supra</u> at 486; <u>Barry v. Phillips</u>, <u>supra</u> at 1045; <u>Frazier v. Okla. Gas & Elec. Co.</u>, <u>supra</u> at 14; see also sec. 25.2511-2(b), Gift Tax Regs. (a gift is complete only when the donor "has so parted with dominion and control as to leave in him no power to change its disposition, whether for his own benefit or for the benefit of another"). Whether the donor has parted with dominion and control and is powerless to change the disposition of the property is governed by State law. <u>Estate of Dillingham v. Commissioner</u>, 88 T.C. 1569, 1575-1576 (1987), affd. 903 F.2d 760 (10th Cir. 1990); <u>Estate of Cummins v. Commissioner</u>, T.C. Memo. 1993-518.

Under Oklahoma caselaw, a donor retains the incidents of ownership, dominion, and control over stocks and other financial instruments, even where the donor intends to make a gift and/or delivers the subject matter of the gift, in the following instances: (1) The donor continues to receive and expend dividends paid on stock; (2) the donor retains the sale proceeds from stock; (3) the donor continues to collect payments on a promissory note; or (4) the donor maintains the ability to cash a certificate of deposit for himself, to change the payee, or to pledge it as collateral. Estate of Davenport v. Commissioner, supra at 1188 (fact that donor did not receive any dividends demonstrated that donor did not exercise any control over the stock); Courtney v. First Natl. Bank, supra at 460 (donor failed to relinquish dominion and control, and alleged transfer of property was not irrevocable); Davis v. Natl. Bank of Tulsa, supra; Barry v. Phillips, supra; Frazier v. Oklahoma Gas & Elec., supra.

Respondent argues that decedent retained dominion and control over Marital Fund assets after January 8, 1997, by collecting dividends and interest on Marital Fund assets, by retaining proceeds from the sale or liquidation of Marital Fund assets, by depositing income generated by Marital Fund assets into bank accounts she owned and/or controlled, and by using income from Marital Fund assets for her personal expenses. We

agree.  From December of 1996 until decedent's death on June 12, 1997, Ms. Powell, in her capacity as decedent's attorney-in-fact, deposited nearly $19,000 of dividends paid on Marital Fund stocks into trust account No. 0825 and more than $5,000 from the redemption of Colonial Fund shares into decedent's joint account No. 6672.  After January 8, 1997, Ms. Powell used income from Marital Fund assets that decedent had allegedly transferred to GFLP to pay for decedent's medical and household expenses, in-home health care, gifts, entertainment, and State and Federal income taxes.

Even after decedent's death, Ms. Powell continued to collect dividends, interest, and proceeds from Marital Fund assets, and she deposited the amounts into accounts that decedent's estate controlled.  The deposits were used for the benefit of the estate, Ms. Powell, and Mr. Gore.  Between June 16 and July 28, 1997, Ms. Powell deposited into decedent's account No. 4495 more than $150,000, consisting of proceeds from the sale of Marital Fund assets and interest paid on Marital Fund assets that were still titled in decedent's or Sidney Gore's name.  Ms. Powell spent approximately $100,000 of funds attributable to or derived from Marital Fund assets that had been deposited into decedent's account No. 4495 to pay for decedent's funeral expenses and her remaining personal and household expenses.  In addition, Ms. Powell and Mr. Gore "borrowed" $36,000 of income attributable to

Marital Fund assets that was deposited into decedent's account No. 4495 after decedent died.

The record overwhelmingly establishes that decedent and/or her estate retained dominion and control over Marital Fund assets after January 8, 1997. Before her death on June 12, 1997, decedent did not surrender any voting rights in Marital Fund stocks, nor did decedent attempt to relinquish dominion or control over Marital Fund stocks. Neither decedent nor Ms. Powell changed the name on any of the investment and bank accounts in the Marital Fund before decedent died. Most significantly, decedent and/or Ms. Powell continued to control and use Marital Fund assets for decedent's benefit after January 8, 1997.

Petitioner argues that decedent relinquished all dominion and control over Marital Fund stocks to TCO when the agency agreement between TCO and GFLP was executed. With regard to the remaining assets of the Marital Fund, petitioner contends that TCO controlled the assets as trustee of the Pamela Powell and Michael Gore Trusts, that Ms. Powell controlled the assets as trustee of decedent's revocable trust, and that Ms. Powell and Mr. Gore controlled the assets as general partners of GFLP. This argument is not supported by credible evidence in the record. The record shows that TCO did not exert any meaningful management authority over Marital Fund assets until months after decedent's

death.  If decedent had actually relinquished dominion and control of the Marital Fund assets to TCO, under the terms of the agency agreement TCO would have collected all income from the property, and TCO would have distributed to decedent only such amounts as GFLP directed.  The reality established by the record is that Ms. Powell, acting on behalf of decedent or her estate, controlled the receipt and disposition of the income from Marital Fund assets without having to request any distributions from TCO or GFLP to pay decedent's expenses.

Petitioner attempts to explain why the dividends, interest, and proceeds of the Marital Fund property were deposited into various bank accounts belonging to or controlled by decedent by arguing that "other bank account names were used because of the problems with getting banks to accept checks not made payable to GFLP".  Petitioner insists, however, that all of decedent's bank accounts were treated as GFLP accounts.  Petitioner's explanation is too facile, and it fails to explain why some dividend and interest checks were deposited directly into GFLP account No. 7045 while others were not.  None of the Marital Fund assets were registered or titled in the name of GFLP, and none of the dividend and interest checks were issued in GFLP's name.[46] Petitioner's explanation also does not explain why $22,415 of the

---

[46]Regardless of the payees' identities, once the checks were deposited, decedent could have transferred the funds to GFLP. Decedent did not do so.

$41,777 of dividends paid during the first 6 months of 1997 was never deposited into GFLP account No. 7045 or why dividend and interest income generated by Marital Fund assets allegedly transferred to GFLP was not transferred to the GFLP account after it was deposited into non-GFLP accounts.

Petitioner relies on the GFLP accounting records prepared by Ms. Bowers after decedent's death to support petitioner's arguments that decedent released all ownership, dominion, and control over Marital Fund assets when she executed the assignment on January 8, 1997. However, the accounting records were created months after the various transactions occurred and are not credible. We view the GFLP accounting records as just one more argument regarding how the Marital Fund assets should have been handled after the January 8, 1997, assignment. The GFLP accounting records represent nothing more than a self-serving and belated attempt to create the appearance that decedent transferred property to GFLP, that GFLP treated all of the bank accounts held in decedent's and Sidney Gore's names as its own property, and that GFLP received all income from Marital Fund assets after January 8, 1997.

As an additional explanation for decedent's treatment of the income generated by Marital Fund assets, petitioner argues that the income decedent retained was actually owed to her by GFLP as payment for assets that decedent sold to GFLP. According to

petitioner, Ms. Bowers set up an account payable in the GFLP accounting records reflecting a debt of GFLP owed to decedent, deductions from that amount for GFLP funds Ms. Powell used to pay decedent's personal living expenses, and interest allegedly paid by GFLP on the debt. Petitioner also relies upon decedent's and GFLP's retained Federal income tax returns for the taxable year 1997 to establish the existence of the debt and to show that GFLP paid interest on the debt.

Respondent argues that petitioner has not explained which transactions gave rise to the debt GFLP allegedly owed to decedent and that the account payable in the GFLP accounting records represents nothing more than "adjusting journal entries, intended, in part, to account for Decedent's at-will expenditure of funds attributed to GFLP". We agree. Neither decedent nor GFLP executed a promissory note or any other documents to evidence GFLP's alleged debt to decedent. The assignment makes no reference to the sale of any of decedent's own property to GFLP. Neither the GFLP accounting records nor the tax returns, which were prepared nearly 2 years after GFLP's debt to decedent allegedly arose, are sufficient to prove that a valid debt existed.

Finally, petitioner argues that decedent parted with dominion and control but that TCO delayed transferring to GFLP legal title to Marital Fund assets. Although TCO apparently has

assumed some responsibility for the delay, the documents upon which petitioner relies are extremely vague regarding TCO's alleged inaction.  Petitioner did not present any testimony from TCO employees to prove when and for how long the delay occurred or to show exactly how TCO was at fault.

It is entirely possible that any delay on the part of TCO occurred well after decedent's death or that the delay was also attributable to decedent's or Ms. Powell's deliberate inattention to the technicalities of title.  TCO had clearly outlined what steps needed to be taken to transfer Marital Fund stocks to GFLP months before decedent's death.  Nevertheless, Ms. Powell did not sign the necessary stock powers when she delivered the stock certificates to TCO, and her only explanation for the failure-- that she thought TCO would assume all responsibility to transfer title to the stock--is not credible.[47]

The record overwhelmingly establishes that decedent or Ms. Powell on decedent's behalf continued to exercise ownership, dominion, and control over Marital Fund assets from January 8, 1997, when decedent withdrew the Marital Fund assets from the

---

[47]TCO had not yet entered into the agency agreement with GFLP when Ms. Powell delivered the stock certificates to TCO. And, although the record shows that Ms. Powell eventually signed stock powers on behalf of decedent to transfer the stocks to GFLP, the record does not reveal when she did so.  TCO was still asking Ms. Powell to sign documents to transfer Marital Fund assets to GFLP as recently as May 2000, and Ms. Powell was still completing the transfer of other property to GFLP in August 2000.

Sidney Gore Trust, to June 12, 1997, the date of her death.[48]

Consequently, we conclude that decedent did not complete any transfer of Marital Fund assets to GFLP before her death on June 12, 1997. We consider, therefore, whether the estate was obligated to include the value of Marital Fund assets allegedly transferred to GFLP in decedent's gross estate, either because she owned them outright on the date of her death or, alternatively, because she held a general power of appointment over the Marital Fund assets on the date of her death.

## IV. Inclusion of Marital Fund Assets in Decedent's Estate

### A. Sections 2033 and 2041

Section 2001 imposes a tax on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States. Section 2051 provides that, for purposes of the tax imposed by section 2001, the value of the taxable estate is determined by deducting from the value of the gross estate allowable deductions.

The gross estate of a decedent who is a citizen or resident of the United States is determined in accordance with chapter 11, subchapter A, part III, of the Code (part III). Part III includes sections 2031 through 2046, which describe different

_____

[48]The absence of any one element of an inter vivos transfer of property is sufficient for us to find that no completed transfer was made. See Fox v. Kramer (In re Estate of Estes), 983 P.2d 438, 445 (Okla. 1999).

types of property interests whose values must be included in the calculation of a decedent's gross estate. Section 2031(a) provides that "The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated." Section 2033 provides that "The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death." Section 2041(a)(2) requires that property with respect to which the decedent had a general power of appointment[49] created after October 21, 1942, also be included in the decedent's gross estate.

We have concluded that decedent, by executing the assignment on January 8, 1997, and exercising dominion and control over the Marital Fund assets from that date to the date of her death, effectively exercised the withdrawal power granted to her by the Sidney Gore Trust declaration. We have also concluded, however, that the assignment was not sufficient to effect a transfer of

---

[49]Sec. 2041(b)(1) defines "general power of appointment" to mean "a power which is exercisable in favor of the decedent, his estate, his creditors, or the creditors of his estate". However, sec. 2041(b)(1)(A) provides that "A power to consume, invade, or appropriate property for the benefit of the decedent which is limited by an ascertainable standard relating to the health, education, support, or maintenance of the decedent" is not a general power of appointment.

Marital Fund assets to GFLP.  Because decedent, on the date of her death, continued to own, control, and use Marital Fund assets, the value of the Marital Fund assets allegedly transferred to GFLP, including income therefrom as of the appropriate valuation date, must be included in decedent's gross estate under sections 2031(a) and 2033.

We recognize, of course, that our holding under section 2033 depends for its accuracy on our conclusion that decedent effectively withdrew the Marital Fund assets from the Sidney Gore Trust.  Even if our conclusion is wrong, however, the value of the Marital Fund assets would still be includable in decedent's gross estate because decedent, on the date of her death, had a general power of appointment within the meaning of section 2041(a)(2) with respect to any Marital Fund assets still subject to the Sidney Gore Trust.

Section 2041(b)(1) defines a general power of appointment as a power exercisable in favor of the decedent, her estate, her creditors, or the creditors of her estate.  A general power of appointment over the corpus of a trust exists where the lifetime income beneficiary has the unrestricted power to distribute the corpus of the trust to herself.  Sec. 20.2041-3(f), Example (3), Estate Tax Regs.  In that situation, the entire corpus of the trust as of the time of death is includable in the decedent's gross estate under section 2041.  Secs. 20.2041-1(b)(1), 20.2041-

3(f), <u>Example</u> (<u>3</u>), Estate Tax Regs. Decedent had an unrestricted power to distribute the corpus of the Marital Fund to herself by reason of her power of withdrawal.

In addition, the Sidney Gore Trust declaration gave decedent "the power to appoint the principal and any undistributed income, to any person" by a provision in her will and authorized the trustees, upon decedent's death, to "distribute the then remaining principal and undistributed income in the Marital Trust, to such appointee or appointees (including the Estate of my Wife), in such manner as my Wife may appoint by her Last Will and Testament." Such language is sufficient to create a general power of appointment, sec. 20.2041-1(c)(1), Estate Tax Regs., and respondent conceded as much in his answer in docket No. 468-02. If any assets remained in the Marital Trust at decedent's death, section 2041(a)(2) requires that the value of those assets be included in decedent's gross estate.

B. <u>Section 2036</u>

A decedent's gross estate includes the value of property interests transferred by the decedent during his or her lifetime if the decedent retained for life the possession or enjoyment of, or the right to the income from, the transferred property. Sec. 2036(a)(1). Petitioner maintains that section 2036(a) is inapplicable because decedent completed a transfer of the Marital Fund assets to GFLP before her death and did not retain enjoyment

of the transferred property. We have already rejected petitioner's argument that decedent completed a transfer of Marital Fund assets to GFLP during her lifetime. Nevertheless, even if we were to assume that decedent successfully transferred Marital Fund assets to GFLP before her death, we would still conclude that the values of the assets are includable in decedent's gross estate under section 2036(a).[50]

The relevant portion of section 2036(a) provides:

SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--

(1) the possession or enjoyment of, or the right to income from, the property * * *

---

[50]Before her death, decedent transferred $2,000 to GFLP to pay the required capital contributions of each of her children and their trusts. In addition, on Jan. 8, 1997, decedent executed the amendment to her trust agreement expressing her intention that "all the property in which I have an interest is from this date forward subject to the trust" and that the trust assets either had been or would be invested in GFLP. Various deposits were made into GFLP's account between Jan. 8 and June 12, 1997, and respondent has stipulated that GFLP was validly formed under Oklahoma law. We shall assume, therefore, that GFLP was in existence and that it had some assets on the date of decedent's death, and we shall consider the parties' arguments regarding the applicability of sec. 2036.

Section 2036(a) is designed to include in a decedent's gross estate "'transfers that are essentially testamentary--i.e., transfers which leave the transferor a significant interest in or control over the property transferred during his lifetime.'" Estate of Abraham v. Commissioner, 408 F.3d 26, 37 (1st Cir. 2005) (quoting United States v. Estate of Grace, 395 U.S. 316, 320 (1969)), affg. T.C. Memo. 2004-39, amended 429 F.2d 294 (1st Cir. 2005). A decedent retains an interest described in section 2036(a) unless he "absolutely, unequivocally, irrevocably, and without possible reservations" parts with possession and enjoyment of the transferred property. Commissioner v. Estate of Church, 335 U.S. 632, 645 (1949). Possession or enjoyment of transferred property is retained for purposes of section 2036(a)(1) where there is an express or implied understanding to that effect among the parties at the time of the transfer, even if the retained interest is not legally enforceable. Sec. 20.2036-1(a), Estate Tax Regs.; see also Estate of Reichardt v. Commissioner, 114 T.C. 144, 151 (2000); Estate of Harper v. Commissioner, T.C. Memo. 2002-121. All of the facts and circumstances surrounding the transfer and subsequent use of the property are considered in deciding whether there was an implied agreement or understanding. Estate of Reichardt v. Commissioner, supra at 151. The taxpayer bears the burden of disproving the

existence of an agreement regarding retained enjoyment, a burden especially onerous in intrafamily situations.  Id. at 151-152.

This Court has applied section 2036(a)(1) to assets transferred to a family partnership in which the decedent retained the possession of, enjoyment of, or the right to the income from the transferred assets.  See, e.g., id. at 150-155; Estate of Harper v. Commissioner, supra.  In each case, we found inclusion in the gross estate appropriate because the decedent failed to curtail his or her enjoyment of the property following the transfer to the family partnership.  Factors indicating an implicitly retained interest under section 2036(a)(1) include transfer of the majority of the decedent's assets, continued use of transferred property, commingling of personal and partnership assets, disproportionate distributions to the decedent, use of entity funds for personal expenses, and testamentary characteristics of the arrangement.  See Estate of Reichardt v. Commissioner, supra (decedent commingled partnership and personal funds, used partnership's checking account as his personal account, and continued to use assets in same manner as before they were transferred); Estate of Strangi v. Commissioner, T.C. Memo. 2003-145 (decedent maintained same relationship to his assets as he had before formation of family partnership), affd. 417 F.3d 468 (5th Cir. 2005); Estate of Thompson v. Commissioner, T.C. Memo. 2002-246 (decedent transferred most of his assets to

partnership and was able to withdraw these assets from partnership at any time), affd. 382 F.3d 367 (3d Cir. 2004); Estate of Harper v. Commissioner, supra (decedent commingled funds, distributions were made disproportionately to decedent, and arrangement possessed testamentary characteristics); Estate of Schauerhamer v. Commissioner, T.C. Memo. 1997-242 (decedent transferred a substantial amount of her assets to a partnership and deposited income from partnership in a personal account that she used to pay personal and partnership expenses).

Section 2036(a), however, provides for an exception to its general inclusion rule. Under the exception, where assets are transferred through a "bona fide sale for an adequate and full consideration in money or money's worth", the value of those assets is not subject to inclusion under section 2036(a). Availability of the exception rests on two requirements: (1) An arm's-length transaction, and (2) adequate and full consideration. Estate of Harper v. Commissioner, supra. The decedent's receipt of a partnership interest is not a bona fide sale for full and adequate consideration where an intrafamily transaction merely attempts to change the form in which the decedent holds property. Estate of Thompson v. Commissioner, supra. In addition, the transfer must be motivated by a legitimate nontax business purpose. See Estate of Bongard v. Commissioner, 124 T.C. 95, 118 (2005); Estate of Bigelow v.

<u>Commissioner</u>, T.C. Memo. 2005-65; <u>Estate of Stone v.</u>
<u>Commissioner</u>, T.C. Memo. 2003-309.

Petitioner asserts that decedent's only interest in the transferred assets was as a beneficiary of the Sylvia Gore Revocable Trust, which held a 32.667-percent limited partnership interest in GFLP. Because GFLP is a separate legal entity formed in compliance with Oklahoma law, petitioner argues that decedent relinquished all control, possession, enjoyment, or right to income upon the alleged transfer of the Marital Fund assets to GFLP. Petitioner argues that decedent retained no benefit or control over the assets and that TCO controlled or managed the GFLP assets during decedent's life. Additionally, petitioner argues that decedent did not execute or contemplate an agreement reserving any control of the transferred assets.

Decedent, however, did not part with possession or enjoyment of the property purportedly transferred to GFLP. At the time of decedent's death, GFLP did not hold title to any of the Marital Fund assets. From its formation until the date of decedent's death, GFLP did not engage in any business or investment activity. Only after decedent's death and long after GFLP's formation were accounting records created purporting to show that decedent transferred a series of Marital Fund assets to GFLP.[51]

---

[51]Accounting manipulations occurring after decedent's death cannot refute the existence of an implied agreement permitting
                                                  (continued...)

Decedent individually or through Ms. Powell as attorney-in-fact continued to receive all of the income from the property transferred to GFLP, directed its deposit, and benefited from its use without restriction.  Ms. Powell continued using Marital Fund assets allegedly transferred to GFLP for decedent's benefit.  Decedent's access to the assets was without restriction, allowing decedent to maintain the same relationship to her assets as existed before the alleged transfer to GFLP.

The circumstances surrounding the alleged transfer and subsequent use of the Marital Fund assets demonstrate an implied agreement between decedent and her children.  Accordingly, because decedent continued to control and to use Marital Fund assets after the alleged transfer to GFLP on January 8, 1997, the assets transferred to GFLP are includable in decedent's gross estate under section 2036.

Decedent's transfer of Marital Fund assets to GFLP also does not qualify for the bona fide sale exception contained in section 2036(a).  Decedent's transfer did not occur through an arm's-length transaction because decedent essentially acquired her interest from herself.  See Estate of Harper v. Commissioner, T.C. Memo. 2002-121.  Decedent stood on both sides of the transaction, and the partnership was formed without any

_____

[51](...continued)
the continued use of transferred assets.  See Estate of Harper v. Commissioner, T.C. Memo. 2002-121.

bargaining or negotiating because the seller and the purchaser were the same person.  Cf. Estate of Stone v. Commissioner, supra (transfers to family partnerships were arm's-length transactions because each member of family was represented by independent counsel and transfers were motivated primarily by investment and business concerns).

Decedent's transfer also was not made for full and adequate consideration.  Decedent's receipt of a partnership interest is not full and adequate consideration within the meaning of section 2036 because decedent used GFLP merely as a vehicle for changing the form in which she held her interest in the Marital Fund assets.  See Estate of Thompson v. Commissioner, T.C. Memo. 2002-246.  Decedent's transfer represents a circuitous "recycling of value" because no change was made to the underlying pool of assets; no one other than decedent made contributions of property or services in the interest of true joint ownership or enterprise.  See Estate of Harper v. Commissioner, supra.  The value of decedent's interest in GFLP is derived exclusively from the assets that decedent allegedly contributed to GFLP.  Under these facts, decedent did not engage in any bona fide transaction for consideration upon the creation and funding of GFLP.  Accordingly, petitioner is not entitled to rely on the exception under section 2036(a).

We hold that, even if Marital Fund assets were transferred to GFLP, the full date-of-death values of those assets are includable in decedent's gross estate under section 2036(a).

V.  Whether the Gross Estate Should Be Reduced by the Amount of GFLP's Alleged Debt to Decedent

The estate listed as an asset of the estate a note receivable from GFLP to decedent.  Petitioner argues that if we include all of the Marital Fund assets allegedly transferred to GFLP in decedent's gross estate under sections 2033 and 2041(a)(2), "it is factually impossible for * * * [decedent] to owe to herself $46,664".  Respondent argues that although the estate has never explained or substantiated the transactions generating the alleged debt GFLP owes to decedent, the gross estate should not be reduced by that amount because the expert witnesses testified at trial that the $46,664 amount was already taken into account in both petitioner's and respondent's determinations of the net asset value of the gross estate.

We concluded earlier in this opinion that petitioner has not proven that decedent contributed or sold any of her own assets to GFLP with the expectation that GFLP would repay her.  A conclusion that the amount of GFLP's alleged debt to decedent is includable in the gross estate would be inconsistent with our findings of fact in this case.  The existence of the alleged debt depends, in the first instance, upon a finding that the Marital Fund assets had been transferred to GFLP.  Our primary finding is

that no such transfer took place.  Moreover, the record
adequately demonstrates that no bona fide debt owed by GFLP to
decedent existed on the date of decedent's death.  Accordingly,
the value of the gross estate must be reduced by $46,664.

VI.  <u>Whether the Value of the Smith Barney Investment Account Is
     Includable in Decedent's Gross Estate</u>

Petitioner argues that including the proceeds of the Smith
Barney account in decedent's gross estate would result in taxing
the same funds twice because that amount was deducted from the
alleged debt GFLP owed to decedent, which increased the overall
value of GFLP.  Petitioner relies solely on the GFLP accounting
records to support petitioner's position.

Respondent argues that petitioner has not provided any
detail regarding the items giving rise to the alleged debts
between GFLP and its partners.  Respondent contends further that
the amount is includable in the gross estate under section 2033
because the value of the Smith Barney account was not reported on
decedent's estate tax return or included as an asset of GFLP in
valuing GFLP or its partnership interests.

The estate did not report the value of the Smith Barney
account as part of decedent's gross estate on Form 706.
Therefore, we sustain respondent's determination that $102,139,
the value of the Smith Barney account, is includable in the gross
estate under section 2033.

VII. <u>Whether the Estate Is Entitled To Deduct Administration Expenses in Excess of Those Allowed</u>

Petitioner contends that the executor's fee, appraisal fees, legal fees, and interest accrued on the Oklahoma death tax and the Federal estate and gift tax liabilities, incurred after filing the estate tax return and in excess of the amounts already allowed, are deductible from decedent's gross estate.

Respondent contends that petitioner has not presented any documentation to substantiate the estate's expenses but acknowledges that petitioner may submit the appropriate forms, along with supporting documentation, to respondent for a determination of reasonableness of the amounts claimed. Alternatively, respondent asserts that petitioner may request additional administration expense deductions in the Rule 155 proceeding, or we may determine the allowable administration expense deductions in a Rule 156 proceeding.

Section 2053(a)(2) provides that the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts for administration expenses as are allowable by the laws of the jurisdiction under which the estate is being administered. Administration expenses include executor's commissions; attorney's fees, including those fees associated with contesting an asserted deficiency; and miscellaneous expenses such as appraiser's fees, accountant's fees, and court costs. Sec. 20.2053-3, Estate Tax Regs. In

addition, interest attributable to a State death tax or Federal estate tax deficiency may be deductible as an administration expense under section 2053. <u>Estate of Bahr v. Commissioner</u>, 68 T.C. 74 (1977).

At the trial, petitioner did not substantiate any additional administration expenses the estate had paid or incurred since filing its estate tax return. However, we do not doubt that the estate has paid or incurred additional administration expenses that are allowable as deductions if substantiated. Petitioner should promptly submit documentation of any additional administration expenses to respondent, and the parties should attempt to reach an agreement regarding this issue. If the parties are unable to do so, we shall decide the issue as appropriate in a Rule 155 or 156 proceeding.

VIII. <u>Whether the Estate Is Entitled To Deduct ad Valorem Tax</u>

The estate claimed a deduction of $1,543 for ad valorem tax on Schedule K of Form 706, which respondent disallowed. Petitioner now maintains that the estate is entitled to deduct $3,367, the full amount of ad valorem tax owed for 1997, under section 2053(a)(3). Respondent argues the estate is not allowed to deduct <u>any</u> of decedent's ad valorem tax because petitioner has not established that the tax was a personal obligation of decedent on the date of her death that met the requirements for deductibility under section 2053.

Ad valorem tax may be deducted from the value of the gross estate if the tax is an enforceable obligation of the decedent on the date of the decedent's death and is allowable under State law. Sec. 2053(a)(3), (c)(1)(B); sec. 20.2053-6(b), Estate Tax Regs. Under Oklahoma law, only ad valorem tax that is a lien on a decedent's property on the date of the decedent's death is an enforceable obligation of the decedent on that date. Okla. Stat. Ann. tit. 68, sec. 808(a) (West 2001). Ad valorem tax becomes a lien on property on the date the tax becomes due and payable. Okla. Stat. Ann. tit. 68, sec. 3101 (West 2001). Ad valorem tax for each fiscal year becomes due and payable on the first day of November. Okla. Stat. Ann. tit. 68, secs. 2804, 2913 (West 2001).

On June 12, 1997, no enforceable obligation existed with respect to decedent's 1997 ad valorem tax. The 1997 ad valorem tax did not become due and payable and a lien against decedent's real property until November 1, 1997. Ms. Powell paid the 1997 ad valorem tax on decedent's home on November 24, 1997.

Petitioner has not offered any evidence to substantiate the amount of any allowable deduction. Moreover, the Oklahoma statute cited by the estate is inapplicable here because there was no conveyance of decedent's property in 1997. Okla. Stat. Ann. tit. 68, sec. 2912 (West 2001). The Oklahoma cases cited by petitioner are equally inapplicable, as they relate to whether a

purchaser or seller is liable for ad valorem taxes when real property is sold and do not address the issue of when the State ad valorem tax liability actually becomes due and payable. <u>Allen v. Henshaw</u>, 168 P.2d 625 (Okla. 1946); <u>Bd. of Commrs. v. Cent. Baptist Church</u>, 276 P. 726 (Okla. 1929). Accordingly, petitioner has not established that the estate is entitled to any deduction for decedent's 1997 ad valorem tax. We sustain respondent's determination disallowing the $1,543 ad valorem tax deduction claimed by the estate.

IX. <u>Conclusion</u>

We have considered the remaining arguments of both parties for results contrary to those expressed herein and, to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.